UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/30/10
```

- - - - - - - - - - - - - - - - - -X
                     :

World Wide Polymers, Inc.,    :   03-CV-8843 (LAP)(RME)
                     :

     Plaintiff,         :   Opinion and Order
                     :

        v.            :

Shinkong Synthetic Fibers   :
Corporation,               :

     Defendant.         :
                     :
- - - - - - - - - - - - - - - - - -X

LORETTA A. PRESKA, Chief United States District Judge

World Wide Polymers, Inc. ("World Wide" or "WWP") brings this action against Shinkong Synthetic Fibers Corporation ("Shinkong") alleging breach of contract, breach of fiduciary duty, and tortuous interference with business relations. Shinkong counterclaims against World Wide for breach of a promise to remit certain funds. Shinkong now moves for summary judgment on World Wide's claims and on its counterclaim. For the reasons stated below, Shinkong's motion for summary judgment is GRANTED as to World Wide's claims and DENIED as to Shinkong's counterclaim.

## I. Background

### A. World Wide, Shinkong, and PET

The following facts are derived from the parties' affidavits, Local Rule 56.1 Statements, and testimony. All

facts are construed and all reasonable inferences are drawn in favor of Plaintiff, the non-moving party.

Polyethylene terephthalate ("PET") resin is a substance used in the production of plastic bottles for the soft drink industry. (Declaration of Richard Barrese in Opposition to Motion by Shinkong Synthetic Fibers Corporation for Summary Judgment ("Barrese Decl.") ¶ 5; Deposition of Richard Barrese ("Barrese Dep.") 12:16-21, Apr. 6, 2009.)  Shinkong manufactures and supplies PET.  World Wide purchases, markets, and resells PET to end-users—sometimes referred to as converters—who then turn the resin into plastic bottles or other products. (Declaration of James Caruso in Opposition to Motion by Shinkong Synthetic Fibers Corporation for Summary Judgment ("Caruso Decl.") ¶¶ 6-8.)  Richard Barrese and James Caruso are World Wide's two principal officers; Barrese is the President, responsible for day-to-day operations, and Caruso is the Vice President, responsible for sales and marketing. (Plaintiff World Wide Polymers, Inc.'s Counter-Statement of Undisputed Material Facts in Opposition to Defendant's Motion for Summary Judgment ("Pl. 56.1 stmt.") ¶¶ 1, 2.)

A company like World Wide may also assist a PET supplier with testing and pre-certification of its resin.  Pre-certification from large bottling companies is often required before those companies will begin purchasing and using a

2

particular supplier's PET. (Caruso Decl. ¶¶ 10-12.)   Because
distributors like World Wide often shoulder the cost of testing
and pre-certification procedures, and may also devote time and
expense in forming relationships with end-users leading up to
certification, distributors will sometimes enter into customer
protection agreements with suppliers. (Id. ¶¶ 12-16.)   A
customer protection agreement prevents a supplier from taking
advantage of a distributor's efforts by preventing the supplier
from using another distributor or selling directly to a
particular end-user. (Id. ¶¶ 17-18.)

### B. The Parties' Initial Interactions

World Wide and Shinkong began discussing the possibility of
working together to introduce Shinkong's PET product, called
Shinpet,[1] to the United States market in 1997. (Id. ¶¶ 75-81.)
In April or May 1998, Paul Chu came to World Wide's New Jersey
office on Shinkong's behalf to discuss the parties' relationship
in greater detail. (Id. ¶ 41.)   The parties discussed customer
protection and orally agreed that Shinkong would provide
protection for "accounts resulting from WWP's efforts once the
customer in question approved SHINPET for use in their
processes.  At that point, WWP would register the customers in
writing with Shinkong and unless Shinkong rejected the account

---

[1] Shinpet is alternatively referred to in the documents as
SHINPET.

as already being serviced by Shinkong directly, the account would be entitled to customer protection." (Id. ¶ 44.)  After this meeting, World Wide began purchasing Shinpet to provide as samples to potential customers.  World Wide subsequently purchased a 20 metric ton trial lot of Shinpet to qualify with its customers in November or December 2008, and then placed an order for 2400 metric tons of Shinpet for the first half of 2009. (Pl. 56.1 stmt. ¶ 85; Caruso Decl. Exs. 3, 4.)

The parties exchanged several written messages over the next few months.  On November 3, 1998, Shinkong sent a fax to World Wide that stated, "PLEASE INFORM END USER SO THAT YOU CAN GET CUSTOMER PROTECTION AT THAT CUSTOMER [sic] AND AVOID DOUBLE EFFORTS." (Caruso Decl. Ex. 2.)  Shinkong repeated this request in faxes on November 17 and 20. (Id. Exs. 4, 5.)  On November 20, 1998, World Wide replied that it would "register each USA customer for exclusive marketing protection upon their approval of Shinpet 5015W." (Id. Ex. 1.)  On November 21, Shinkong informed World Wide that there were several smaller distributors who might work with Shinkong in the North American market, and "IF SOMEONE IN FUTURE PERFORMS SATISFIED SALES RECORD FOR 1 YEAR OR SO, WE MIGHT CONSIDER TO GIVE HIM AGENCY RIGHT FOR CERTAIN REGION BUT, ONE THING IS FOR SURE, YOU WILL ABSOLUTELY GET PROTECTION AT CUSTOMER(S) YOU HAVE ACTUAL BUSINESS WITH." (Id. Ex. 7.)  World Wide replied on November 23 that it "would not

have embarked on this venture to promote Shinpet in North America unless we were 100% confident our sales record would insure an exclusive agency agreement between our two good companies." (Id. Ex. 8.)

World Wide and Shinkong also discussed obtaining Pepsi approval for Shinpet and, after some initial stumbling blocks, World Wide began assisting Shinkong with the approval process. (Id. ¶ 70.)  Pepsi approval was needed to sell Shinpet to certain end-users, such as Ball Plastics ("Ball"),[2] who converted the resin into Pepsi products.  World Wide considered Pepsi approval an important goal because Pepsi converters could be sold a significantly higher volume of material than other end-users. (See Caruso Dep. 162:22-163:8.)

On January 22, 1999, in response to Shinkong's request that World Wide "INFORM END USER(S) . . . TO PROTECT YOUR EXCLUSIVE SALES RIGHT," (Id. Ex. 13), World Wide sent Shinkong a list of five customers "to register . . . for the exclusive sales and marketing rights for Shinpet PET." (Id. Ex. 14.)  The five customers were Grafco PET Packaging Technologies, Premier Plastics, Setco Inc., Silgan Plastics Corporation, and QDC Plastic Container Co. (Id.)  Shinkong thanked World Wide for providing the "customer list" but requested clarification as to

---

[2] Ball is alternatively referred to in the documents as Ball Plastic Container.

the spelling of one of the customer's names. (Id. Ex. 15.)
World Wide responded with a clarification. (Id. Ex. 16.)

### C. The May 1999 Meeting and Subsequent Correspondence

In May 1999, Caruso travelled to Taipei to meet with Thomas
Wu, Shinkong's Chairman, to discuss the continuation and
expansion of the parties' business. (Pl. 56.1 stmt. ¶ 4.)
Caruso met with Chairman Wu and others on May 5 and discussed
the activities that each party would undertake to market and
distribute Shinpet in the United States. (Caruso Decl. ¶¶ 79-
91.)  The parties orally agreed that "WWP would market and
distribute Shinkong['s] product in the U.S. and Shinkong would
provide customer protection, a supply of product at competitive
prices, and technical support to accomplish this." (Id. ¶ 87.)

Later that day, Caruso sent a follow-up fax to Chairman Wu,
Executive Vice President Y.L. Lin, and Vice President Simon
Shih. (Pl. 56.1 stmt. ¶ 5; Caruso Decl. Ex. 23.)  The fax
included a list of customers that World Wide was "registering
with Shinkong for protection in the North American Market."
(Caruso Decl. Ex. 23.)  This customer list included Ball and
"Schmal Bach-Lubeca" ("Schmalbach").[3] (Id.)  Caruso sent two more
faxes to Shinkong on May 11, 1999.  The first thanked Chairman

---

[3] Schmalbach is alternatively referred to in the documents as
Schmalbach-Lubeca, SchmalBach-Lubeca, and SL Plastics.  As with
the different references to Ball, these names all appear to
refer to the same entity. (See Barrese Dep. 193:11-14.)

Wu for their meeting; the second listed "issues which require[d] action by Shinkong as well as issues which [Shinkong had] asked WWP to execute." (Id. ¶¶ 96-97, Exs. 26-27.)  Customer protection was not mentioned in either of these faxes. (Id. Ex. 26-27.)

**D. The May 12, 1999 Fax**

On May 12, 1999,[4] Shinkong sent a fax to World Wide that outlined its understanding of the agreement reached at the parties' May 5 meeting. (Id. Ex. 28.)  The first point stated:

> SHINKONG AGREES TO PROTECT THOSE ACCOUNTS
> INDEPENDENTLY DEVELOPED BY WWP AND APPROVED BY
> SHINKONG.  IN THE MEANTIME, IN ORDER TO AVOID INTERNAL
> COMPETITION, WWP AGREES NOT TO INTRODUCE SHINPET PET
> TO ANY ACCOUNTS SPECIFIED BY SHINKONG.  WWP ALSO
> AGREES TO REGULARLY BUY ABOUT 460MT SHINPET 5015W ON A
> MONTHLY BASIS WITHOUT PEPSI COLA APPROVAL.  AT THE
> YEAR END, SHINKONG WILL REVIEW WWP'S SALES
> PERFORMANCE.

(Id.)

> The second point stated:
>
> SHINKONG AGREES TO REDUCE SALES PRICE TO COVER THE
> DUTY PORTION (USD16/MT + 7.8%) OF TRANSACTIONS UNTIL
> THAILAND GSP STATUS IS VOTED BACK IN, INSURING WWP CAN
> CONTINUOUSLY SUPPLY SHINPET PET TO ITS CURRENT
> CUSTOMERS.  ALSO, ONCE THE U.S. GOVERNMENT REFUNDS THE
> DUTIES PAID.  THEN THE TOTAL AMOUNT OF THE AFORESAID
> DUTIES SHALL BE REFUNDED TO ESCROW OR BANK ACCOUNTS
> DESIGNATED BY SHINKONG.  IN THE EVENT OF PRICE HIKE
> DURING THE PERIOD, BOTH TWO PARTIES AGREE SALES PRICE
> WILL BE PROPORTIONALLY ADJUSTED.

---

[4] The May 12 fax from Shinkong, as well as other faxes from Shinkong during this period, erroneously list the year as 1998. These faxes were actually sent in 1999. (See Pl. 56.1 stmt. ¶ 6.)

(Id.)

The third point stated that "WWP AGREES TO TRY ITS UTMOST TO HELP SHINKONG GET OFFICIAL PEPSI COLA APPROVAL FOR SHINPET 5015W BEFORE END OF 1999." (Id.) The fifth point stated that "SHINKONG AT THE MOMENT CAN'T GRANT OPEN ACCOUNT PAYMENT TERMS TO WWP BECAUSE IT'S AGAINST COMPANY POLICY. ALTERNATIVELY, SHINKONG WILL BE STUDYING THE POSSIBILITY OF D/A INSURANCE TO RELIEVE WWP FINANCIAL BURDEN. IN THE RESPECT, WWP OUGHT TO PROVIDE ITS CUSTOMERS' NAME(S) AND SUBMIT WWP FINANCIAL REPORT DULY SIGNED BY CPA (CERTIFIED PUBLIC ACCOUNTANT) TO SHINKONG." (Id.) This fax was signed by Simon Shih, Johnny Chang, and Andrew Hsu. (Id.) World Wide acknowledges that this fax memorialized the agreement that the parties reached following the May 5 meeting. (Pl. 56.1 stmt. ¶ 7.)

### E. The Parties' Interactions July-August 1999

On July 14, 1999, World Wide sent a fax to Paul Chu that expressed concern that multiple departments at Shinkong were offering Shinpet to customers in the United States market. (Declaration of Todd Geremia, Sept. 25, 2009 ("Geremia Decl.") Ex. I.) World Wide was concerned that Shinkong could not protect its registered customers if the different departments were unaware of which customers each department was offering Shinpet to. (Id.) After expressing hope that the parties could

8

work together to protect World Wide's registered customers, World Wide stated that it had "a complete understanding Shinkong will continue to service the accounts which prior transactions have been confirmed [sic] such as Crystal Geyser, Perrier, Alco & Mitsubishi." (Id.)

On July 21, 1999, World Wide again expressed concern to Shinkong that B&H Polymers, another PET marketer, had approached Schmalbach and had informed the company that it was the exclusive marketer of Shinpet for the North American market. (Id. Ex. 36.)  World Wide speculated that another company called Mitsubishi had purchased the material from Shinkong and sold it to B&H. (Id.)  World Wide was "embarrass[ed]" because it was scheduled to deliver a sample to Schmalbach that same week. (Id.)  World Wide stated that "[a]pparently [its] reservations about Shinkongs' [sic] ability to protect WWP's registered customers were correct." (Id.)

Paul Chu responded on July 30 that he had forwarded a report concerning World Wide's complaints to Chairman Wu. (Id. Ex. 37.)  He indicated that the Chairman had requested the sales department to investigate the case and correct the problem.  On August 31, Paul Chu informed World Wide that Shinkong had reevaluated its business setup and had decided to transfer all sales responsibilities for the North American market back to the sales department. (Id. Ex. 39.)  World Wide's new contacts at

Shinkong were Lin Hong Hsiao and Simon Shih. (Id.)  Neither the
July 30 fax nor the August 31 fax mentioned customer protection.

### E. The Parties' Interactions September–October 1999

On September 15, 1999, Shinkong indicated that it was still
awaiting World Wide's "[e]nd user information for all previous
shipment[s]." (Barrese Dep. Ex. 7.)[5]  World Wide sent a fax to
Shinkong later that day with a list of end users under two
different headings: "USA Shinpet Customers" and "Pending
Shinpet/ Pepsi Approval." (Id. Ex. 8.)  Perrier and Schmalbach
were not included in the fax; Ball was listed under the heading
"Pending Shinpet/ Pepsi Approval." (Id.)  Shinkong responded
later that day that the list did not meet Shinkong's
requirements. (Id. Ex. 9.)  Shinkong requested that World Wide
submit the list in a table format and include each customer's
name, address, contact person, and "Q'ty from SK." (Id.; Pl.
56.1 stmt. ¶ 21.)

On September 16, World Wide responded that it "would be
pleased to furnish Shinkong with the full details of all of
[its] current and potential customer [sic] who are currently
testing" but that it "require[d] Shinkong letter of protection
[sic] for all of the customers listed below as well as [the]
customers listed on yesterday's fax." (Caruso Decl. Ex. 41.)

---

[5] Unless otherwise noted, exhibits to the Barrese Deposition are
attached as Exhibit G to the Geremia Declaration.

World Wide requested "a signed statement that Shinkong [would] agree that all marketing of Shinpet to the customers [it] requested protection on [would] be handled through WWP." (Id.) World Wide would provide the requested information upon receipt of the signed protection agreement. (Id.)  World Wide included a list of customers under three different headings: "Current," "Customers Currently Testing Shinpet for Q4 Purchases," and "Pending Shinpet/ Pepsi Approval." (Id.)  Perrier was not on the list; Schmalbach was listed as a customer currently testing Shinpet, and Ball was listed as pending Shinpet/Pepsi approval. (Id.; Pl. 56.1 stmt. ¶ 22.)

Over the following two weeks, World Wide persistently followed up on its request for a letter of protection by stating that it was awaiting "confirmation on the customers that [it] registered last week," (Barrese Dep. Exs. 11, 12), asking for an explanation for Shinkong's "non-action on this request," (Id. Ex. 13), and stating that it was awaiting "formal confirmation [that] full protection would be extended to [its] registered customers," (Id. Ex. 14).

Shinkong finally replied on October 1.  It stated that its policy in regards to World Wide's request was to "[f]ully protect all current customers listed on [the] fax of Sept. 16, provided their transaction with WWP [could] be documentary [sic] verified." (Caruso Decl. Ex. 42.)  For these customers, Shinkong

requested that World Wide "provide[] related transaction records/documents." (Id.)  Shinkong also stated that "[c]ustomer[s] who [were] currently testing Shinpet listed on [the] fax of Sept. 16, [would] be protected until end of 1999 and reviewed in Jan. 2000" but that "Schmalbach-Lubeca [was] excluded from this list." (Id.)  Other customers were "open." (Id.)

World Wide replied to each of Shinkong's points in a fax later that day.  As to current customers, World Wide noted the "[p]rotection of [its] customers indicated on Sept 16th[] Fax [sic]." (Barrese Dep. Ex. 16.)  In response to Shinkong's request for transaction records for these customers, World Wide stated that "[s]ales contracts and Purchase Orders [were] always available for [Shinkong's] review only within the conifers [sic] of our USA office." (Id.)  As to customers currently testing Shinpet, World Wide stated that it would "formally register these new potential customers once they purchase[d] Shinpet." (Id.)  Finally, as to Shinkong's position that other customers remained open, World Wide responded that the point was "noted." (Id.)

On October 29, World Wide sent a fax to Shinkong stating that it "officially requested sales and marketing protection for current Shinpet customers as well as potential customers who were testing and considering using Shinpet.  [WWP had] yet to

12

receive [Shinkong's] official reply to this request." (Id.
Ex. 17; Pl. 56.1 stmt. ¶ 30.)  Barrese testified that, given the
parties' correspondence on October 1, the October 29 fax could
have been sent in response to another message from Shinkong or
could have been a mistake. (Barrese Dep. 150:21-152-15.)

Also in October, Shinkong again requested sales records for
World Wide's end users.  In a fax dated October 29, World Wide
referred Shinkong to its in-house review policy as stated in its
September 16 fax. (Barrese Dep. Ex. 17.)  However, after
assurances from Shinkong that it would not transfer information
to third parties, World Wide sent Shinkong a fax on November 5
listing various end-users, their average monthly requirements
for Shinpet (or listing "Testing" or "PEPSI Approval"), and
their addresses and contacts. (Caruso Decl. Ex. 44.)  Ball was
listed on this fax with a heading of "PEPSI Approval" instead of
an average monthly requirement. (Id.)

## F. Subsequent Interactions

On December 7, Hong Hsiao Lin sent World Wide a fax
indicating that he had just taken over as the PET point-person
for Shinkong. (Caruso Decl. Ex. 46.)  He stated that Shinkong
would handle any issues with Mitsubishi's sales of Shinpet in
the North American market "fairly and objectively." (Id.)  He
concluded by asking World Wide to "please trust Shinkong's
assurance to protect [World Wide's] registered customers." (Id.)

13

In April 2000, World Wide became concerned that Mitsubishi had contacted Ball to sell Ball Shinpet. (Pl. 56.1 stmt. ¶ 32.) Shinkong replied that the Ball situation was "a misunderstanding" and that Shinkong had "immediately taken necessary action to correct it" by telling Mitsubishi to halt its marketing activity with Ball. (Barrese Dep. Ex 23.) Shinkong also clarified its position regarding Pepsi converters, requesting that World Wide not approach Ball or other Pepsi converters until after Shinpet received Pepsi approval. (Id.) Prior to this approval, Shinkong would "neither appoint, nor authorize any agent to handle [the] sale of SHINPET resin to Ball and other U.S. Pepsi converters." (Id.)

On April 18, 2000, World Wide thanked Shinkong for halting Mitsubishi's contact with Ball. (Pl. 56.1 stmt. ¶ 32; Caruso Dep. Ex. 36.) In light of the incident, though, World Wide informed Shinkong that it had asked its "attorney to prepare a customer protection agreement document where Shinkong would honor the sales channel WWP ha[d] developed on [Shinkong's] behalf." (Id.) World Wide expressed its desire that Shinkong would inform Mitsubishi not to contact any of World Wide's other protected customers. (Id.) Finally, World Wide explained that it had

> initiated and maintained contact with Pepsi for the
> purposes of obtaining Shinpet 5015W Pepsi NA approval
> on [Shinkong's] behalf.  [World Wide had] spearheaded

> this project with the full understanding [that]
> Shinkong [would] authorize only WWP to be the sales
> channel to converters in the Pepsi system.  If
> [Shinkong had] no intentions to honor this
> arrangement,

World Wide wished to be advised. (Id.)

Sometime in May 2000, Frank Lee, a newly-appointed contact at Shinkong, forwarded World Wide a non-exclusive agency agreement for World Wide's review. (Caruso Decl. ¶¶ 147, 150.) World Wide replied that it was "not interested in signing a one-sided non-exclusive agency agreement." (Id. Ex. 57.)

On June 16, 2000, World Wide sent Shinkong "a customer protection / commission agreement" for Shinkong to review and accept. (Barrese Dep. Ex. 24.)  World Wide informed Shinkong that it would "submit a client list upon receiving [Shinkong's] acceptance of the agreement." (Id.)  Shinkong never signed this proposed agreement. (Pl. 56.1 stmt. ¶ 38.)

On October 20, 2000, World Wide wrote to Shinkong that it was "concerned about [Shinkong's] inability to acknowledge [World Wide's] request for customer protection for specific converters." (Caruso Decl. Ex. 60.)  On October 26, Frank Lee sent an email asking World Wide to "clearly define the meaning of customer registration." (Caruso Dep. Ex. 39.)  The email also stated that "[d]ue to the concern of anti-trust allegation [sic], the Resin Division is prohibited to give [sic] the so-called 'CUSTOMER PROTECTION' to any of our agents." (Id.)

15

On February 1, 2001, World Wide wrote that per Shinkong's request, World Wide would "formally list all current Shinpet customers in North America in order to receive customer protection from Shinkong." (Caruso Decl. Ex. 63.)  "Customer protection [would] be defined as: WWP [was] the marketing channel for this specified account.  This would mean no other agent, broker or Shinkong employee [could] engage in marketing discussions for the sale of Shinpet." (Id.)

World Wide circulated another draft agreement, entitled "Exclusive Sales Agreement," in February 2001. (Pl. 56.1 stmt. ¶ 42.)  Shinkong never signed this proposed agreement. (Id.)  Instead, Shinkong subsequently circulated its own proposed "non-exclusive distributor" agreement, which World Wide did not sign. (Id. ¶¶ 43-44.)

On May 9, 2001, World Wide sent Shinkong an email with the heading "WWP Exclusive Agency Protection." (Barrese Dep. Ex. 29.)  World Wide stated that it would be happy to assist Shinkong in obtaining Pepsi approval for Shinpet and would cooperate "in intervening in the SL plastics project" but that it required "specific assurances that [it would] be properly protected by Shinkong with [its] existing customers as well as the specific Pepsi converters which [it had] targeted as potential partners with Shinkong." (Id.)  World Wide added that it would "honor the direct marketing channel [Shinkong had]

already established on [its] own such as SL Plastics, CGR and
Perrier." (Id.)  World Wide also included a list of converters
that it "want[ed] incorporated into a formal exclusive agency
agreement." (Id.)

Shinkong responded to World Wide On May 21. (Geremia Decl.
Ex. J.)  Shinkong told World Wide that as it had "mentioned
several times" before, Shinkong's policy was to not "appoint any
exclusive agent/distributor/broker in any marketing territory."
(Id.)  Shinkong noted that it was in the process of verifying
the customer list that World Wide had attached to its May 9
email and that Shinkong would "not be liable to any claim on
customer registration and protection." (Id.)

Shinpet received Pepsi North American approval effective
June 8, 2001. (Caruso Decl. ¶ 179, Ex. 70.)  World Wide informed
Shinkong of this fact and asked Shinkong to forward it prices
for shipments to World Wide's "protected Pepsi customers." (Id.
Ex. 70.)  After Shinkong requested more specific information on
these end users—including their names, locations, and monthly
requirements—World Wide replied that it would send this
information once Shinkong acknowledged that Ball, Containers
Northwest Co., and Plastipak Packaging Inc. were World Wide's
protected Shinpet accounts. (Geremia Decl. Ex. K.)  Shinkong did
not confirm this; rather, it asked World Wide whether it had a
better chance of doing business with Containers Northwest or

Ball.  Shinkong stated that World Wide could "not have two[; it had to] choose one from them." (Id. Ex. K.)

The parties' crumbling relationship came to an end in late 2001.  In the summer and fall of 2001, Shinkong reached an agreement with Perrier to supply Shinpet directly to Perrier. (Caruso Decl. ¶ 184.)  In December 2001, Shinkong informed World Wide that it intended to use a setup on the West Coast to distribute Shinpet. (Id. Ex. 75.)  This setup was used to distribute Shinpet to Perrier and Ball. (Id. ¶ 185.)  Shinkong also sold Shinpet directly to Schmalbach. (Id. ¶ 186.) Believing that Shinkong was intent on driving World Wide out of the market, World Wide began to seek out other resin suppliers. (Id. ¶ 192.)  World Wide currently purchases resin from most other suppliers on the market. (Pl. 56.1 stmt. ¶ 51.)  Shinkong has ceased selling to all of World Wide's allegedly protected customers except Perrier. (Caruso Decl. ¶ 206.)

### G. Purchase Order 1664

World Wide guaranteed to remit to Shinkong immediately any duties refunded by the United States Government related to World Wide's purchase order 1664. (Pl. 56.1 stmt. ¶ 50.)  In a letter dated September 6, 2001, World Wide indicated to Shinkong that the total duties it owed amounted to $94,867.20. (Id.; Barrese Dep. Ex. 30.)  To date, World Wide has not remitted this money to Shinkong. (Reply to Counterclaim ¶ 7.)

18

## H. Procedural Background

World Wide filed the instant action on November 7, 2003,
alleging breach of contract, breach of fiduciary duty, tortious
interference with business relations, and unfair and deceptive
trade practices. (Complaint [dkt. no. 1].)  Shinkong filed a
motion to dismiss the Complaint on March 22, 2004.  The Court
granted Shinkong's motion as to World Wide's claim for unfair
and deceptive trade practices on August 4, 2004.  Shinkong then
answered the Complaint on August 30, 2004 and simultaneously
counterclaimed against World Wide for breach of contract.
(Answer and Counterclaim [dkt. no. 15].)  World Wide replied to
the counterclaim on September 14, 2004.

The parties subsequently entered into a lengthy period of
discovery, inactivity, and adjournments.  In June 2008, almost
five years after World Wide filed the Complaint, the parties
agreed to a discovery cut-off deadline of February 28, 2009.
The Court subsequently granted a joint request to extend the
deadline to April 30, 2009.  On April 29, 2009, the parties
wrote to the Court seeking another extension of the discovery
deadline to August 21, 2009, principally to accommodate World
Wide's need to retain a damages expert. (Endorsed Letter from
Richard De Palma and Todd Geremia, Feb. 19, 2009 [dkt. no. 31].)
World Wide proposed to submit its expert disclosure by June 10,
2009.  The Court granted the request but noted that no further

extensions would be granted. (Endorsed Letter from Todd Geremia, Apr. 30, 2009 [dkt. no. 32].)

World Wide failed to submit the expert report by the required date. Instead, World Wide submitted the expert report on July 29, 2009, approximately seven weeks late. On August 24, 2009, World Wide sought yet another extension of time to complete expert discovery. The Court denied both this request and World Wide's sub silentio request that the Court accept its expert report filed seven weeks late. The Court struck World Wide's request for damages and ordered the parties to proceed with World Wide's claim for injunctive relief. (Revised Order, Aug. 24, 2009 [dkt. no. 33].)

World Wide moved for reconsideration of the Court's Order striking its request for damages. The Court denied this motion on September 18, 2009, noting that World Wide had failed to highlight any "matters or controlling decisions which counsel believe[d] the court ha[d] overlooked." (Endorsement, Sept. 18, 2009 [dkt. no. 42] (quoting Local Civil Rule 6.3).) The Court also noted that "discovery orders are meant to be followed. 'A party who flouts such orders does so at his peril.'" (Id. (quoting Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 853 (2d Cir. 1995)).)

Shinkong filed the instant motion for summary judgment on September 25, 2009. [dkt. no. 43.]

## II. Discussion

World Wide claims that the May 12, 1999 fax from Shinkong constituted an exclusive distributorship agreement and that Shinkong breached that agreement by selling directly to World Wide's protected customers. (Compl. ¶¶ 32–38; Pl. 56.1 stmt. ¶ 7.)  World Wide also claims that Shinkong breached its fiduciary duty to World Wide, tortiously interfered with World Wide's business relationships, and continues to misappropriate the business of World Wide and Shinkong's joint venture. (Compl. ¶¶ 39–51, 56–60.)  Shinkong has moved for summary judgment on the grounds that World Wide cannot establish the type of irreparable injury required for an injunction and, moreover, that Shinkong is entitled to summary judgment on World Wide's claims.  Shinkong also moves for summary judgment on its counterclaim that World Wide has failed to make good on its promise to remit $94,867.20.

### A. Summary Judgment Standard

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and [] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. See Celotex, 477 U.S. at 323; see also FDIC v. Giammettei, 34 F.3d 51, 54 (2d

Cir. 1994). When making this determination, a court must review the record in the light most favorable to the non-moving party and draw all reasonable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 253 (2d Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The parties have assumed that New York State law governs World Wide's asserted claims. The Court therefore applies New York law.

### B. World Wide's Claim for Injunctive Relief

World Wide's sole remaining request for relief is a temporary and permanent injunction "restraining Shinkong from continuing to directly and independently contact and sell SHINPET to WWP's Protected Customers without the involvement of, or compensation to, WWP." (Compl. ¶ 57.) Because remedies available at law would not be inadequate to compensate World Wide for its injury, an injunction is unavailable here.

### 1. Injunctive Relief is Not Available

An injunction is an "extraordinary remedy." Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 405 (2d Cir. 1973); see Kane v. Walsh, 295 N.Y. 198, 205 (N.Y. 1946).

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 ( 2006).   World Wide therefore must demonstrate:

> (1) that it has suffered an irreparable injury;
> (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury;
> (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

Id.

The loss of customers and business resulting from the breach of an exclusive distributorship agreement is typically compensable in monetary damages. See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72-73 (2d Cir. 1979).   In Jackson Dairy, for example, the plaintiff was the exclusive distributor of the defendant's products in a certain geographical area. Id. at 71.   The defendant began bypassing the plaintiff by selling its products to two grocery store chains located outside of the geographical area; the chains then supplied their retail outlets inside of the area with the products. Id. at 71-72.   The Court of Appeals for the Second Circuit reversed the district court's order restraining the defendant from selling directly to the two grocery store chains. Id. at 72.   "Clearly," the court stated, "money would be

adequate compensation for the loss" of business resulting from a
breach of the contract. Id.  While the plaintiff also alleged
that the breach had damaged relations and business with other
customers that the plaintiff was now unable to service on the
delivery route, the Court of Appeals held that even this alleged
injury would be "readily compensable in monetary damages." Id.
at 73.

Other courts in this district and elsewhere have similarly
found that injuries resulting from breaches of distributorship
agreements are readily compensable with monetary damages. See
John Paul Mitchell Sys. v. Quality King Distribs., Inc., 106 F.
Supp. 2d 462, 473-75 (S.D.N.Y. 2000) (finding that a loss of
distributors could "be quantified and damages [could] be
assigned" where a manufacturing company alleged disruption of
its exclusive distribution network); Dana Distribs., Inc. v.
Crown Imports, LLC, 853 N.Y.S.2d 111, 112 (N.Y. App. Div. 2d
Dept. 2008) (finding that the plaintiffs had failed to
demonstrate that they would suffer irreparable harm from an
alleged breach of a distribution agreement); Mar v. Liquid Mgmt.
Partners, LLC, 880 N.Y.S.2d 647, 648 (N.Y. App. Div. 2d Dept.
2009) (finding that the plaintiffs had failed to demonstrate
that they would suffer irreparable harm from an alleged breach
of an exclusive distribution agreement even though the

24

plaintiffs argued that their business would dissolve as a result
of the breach).

World Wide alleges that the agreement in the instant case
was an exclusive distribution agreement. (Pl. 56.1 stmt. ¶ 8.)
As in the cases cited above, the loss of business resulting from
Shinkong's alleged breach of the agreement is readily
compensable in monetary damages.   World Wide can calculate the
amount of money it has lost from Shinkong's alleged sales.   In
fact, World Wide alleges damages in the amount of $3,177,555.69,
demonstrating the "compensability of th[e] loss of customers or
business in dollars and cents." Jackson Dairy, 596 F.2d at 73.

World Wide's argument that the alleged distribution
agreement was "in the nature of a non-compete agreement" is
unavailing. (Pl. Br. 16.)  An injury resulting from breach of a
non-compete agreement may be irreparable because of the
difficulty in calculating "monetary damages that would
successfully redress the loss of a relationship with a client
that would produce an indeterminate amount of business in years
to come." Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d
Cir. 1999).  In the instant case, however, the amount of
business that World Wide has allegedly missed out on is readily
determinable by seeking sales records from Shinkong and World
Wide's allegedly protected customers.  This determinability is
made even clearer by World Wide's admission that Perrier is the

only protected customer to whom Shinkong continues to sell
Shinpet. (Pl. Br. 16.)

While a loss of good will may be difficult to calculate,
"there is no irreparable harm where the loss of goodwill is
doubtful and the loss of a profitable line of business is
compensable by monetary damages." Fox Ins. Co. v. Envision
Pharm. Holdings, Inc., No. CV-09-0237 SJF ARL, 2009 WL 790312,
at *7 (E.D.N.Y. Mar. 23, 2009) (citing Tom Doherty Assocs., Inc.
v. Saban Entm't, Inc., 60 F.3d 27, 37-38 (2d Cir. 1995)).   In
the instant case, the length of the litigation and World Wide's
own admissions cast doubt on whether it has, or will, suffer any
loss of good will.   The alleged breach first occurred over eight
years ago. (See Caruso Decl. ¶¶ 175-85.)   While World Wide
asserted a claim for an injunction in the Complaint, it did not
move for a preliminary injunction. See JSC Foreign Economic
Ass'n Technostroyexport v. Int'l Dev. and Trade Services, Inc.,
295 F. Supp. 2d 366, 390 (S.D.N.Y. 2003) (holding that "the
plaintiff's six-year delay in filing the complaint . . ., as
well as the six-week delay between filing the complaint and
seeking the preliminary injunction, argues against a finding of
irreparable harm").

Aside from conclusory statements in its memorandum of law,
World Wide has not pointed to any evidence in the record that
would establish that it is unable to obtain PET from suppliers

or sell PET to end-users. See Shepard Indus., Inc. v. 135 East 57th Street, LLC, No. 97 CIV. 8447 (DAB), 1999 WL 728641, at *8 (S.D.N.Y. Sept. 17, 1999) ("[C]onclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm."). To the contrary, World Wide currently purchases PET resin from "[a]lmost every supplier that makes the product," (Caruso Dep. 6:17-18), and has been able to "stabilize" its business to some extent, (Barrese Decl. ¶ 76).

In sum, World Wide has failed to establish a genuine issue of material fact as to whether it has suffered the type of irreparable harm necessary to obtain an injunction. Shinkong is therefore entitled to summary judgment on World Wide's fifth cause of action for an injunction.

### 2. Perrier Was Not a Protected Customer

While the grounds set forth above are sufficient to grant Shinkong's motion for summary judgment as to World Wide's claim for injunctive relief, a review of the merits of the Complaint demonstrates that summary judgment in Shinkong's favor would be appropriate even if injunctive relief were available. World Wide's remaining three causes of action are all premised on Shinkong's alleged direct sales to World Wide's protected customers. (See Compl. ¶¶ 36, 42, 49.) Perrier is the only allegedly protected customer to whom Shinkong still sells Shinpet. (Opposition 16; Caruso Decl. ¶ 206-07.) Perrier's

status as a protected customer is therefore critical for World Wide to succeed on its claim for injunctive relief.

World Wide argues that Caruso's May 5 meeting with Chairman Wu resulted in a binding agreement, the terms of which were memorialized in Shinkong's May 12, 1999 fax. (Pl. 56.1 stmt. ¶ 104; Caruso Decl. ¶¶ 79-98.)  The May 12 fax stated that Shinkong "AGREE[D] TO PROTECT THOSE ACCOUNTS INDEPENDENTLY DEVELOPED BY WWP AND APPROVED BY SHINKONG." (Caruso Decl. Ex. 28.)  The fax also stated that "WWP AGREE[D] NOT TO INTRODUCE SHINPET PET TO ANY ACCOUNTS SPECIFIED BY SHINKONG." (Id.)  The fax did not specify a process for Shinkong's approving World Wide's customers.  Both before and after the date of this fax, however, World Wide submitted to Shinkong lists of customers to register for protection. (See Pl. 56.1 stmt. ¶ 94; Caruso Decl. Exs. 14, 23, 41.)  World Wide claims that customers were deemed approved if not objected to, (Caruso Decl. ¶ 102), and that Shinkong told World Wide that it would inform them when a customer was not approved, (Caruso Dep. 171:19-20).

### i. Registration and Acceptance

Regardless of whether silence constituted approval within the meaning of the May 12 fax, Shinkong has failed to raise a genuine issue of material fact as to whether Perrier was a protected customer.  World Wide acknowledges that it never

submitted Perrier's name to Shinkong for registration as a
protected customer because Shinkong told World Wide that Perrier
would not be approved. (See Caruso Decl. ¶ 168; Opposition 11.)
Perrier's non-protected status was confirmed by World Wide on
July 14, 1999, when it stated that it had "a complete
understanding that Shinkong [would] continue to service the
accounts which prior transactions [had] confirmed such as . . .
Perrier." (Geremia Decl. Ex. I.)  World Wide again confirmed
that Perrier was Shinkong's own customer in May 2001, stating
that it would "honor the direct marketing channel [Shinkong]
ha[d] already established [with] . . . Perrier." (Barrese Dep.
Ex. 29.)  Rather than attempting to register Perrier as a
protected customer, World Wide "offer[ed] to assist [Shinkong]
in any marketing or logistical issues which [might] arise."
(Id.)  World Wide went on to distinguish other customers that it
had developed on Shinkong's behalf, requesting formal
recognition for those customers as World Wide accounts. (Id.)

### ii. Good Faith and Fair Dealing

Despite acknowledging that it never attempted to register
Perrier as a protected customer and that Shinkong never approved
Perrier as a protected customer, World Wide argues that Perrier
was protected because Shinkong breached the duty of good faith
and fair dealing by misrepresenting its relationship with
Perrier and using World Wide to make contacts with individuals

29

at the company.  Under New York law, "[i]mplicit in all
contracts is a covenant of good faith and fair dealing in the
course of contract performance." Dalton v. Educational Testing
Service, 87 N.Y.2d 384, 389 (N.Y. 1995).  The covenant
encompasses "any promises which a reasonable person in the
position of the promisee would be justified in understanding
were included" and it prohibits either party from acting in a
manner "which will have the effect of destroying or injuring the
right of the other party to receive the fruits of the contract."
Id. (citations and internal quotations omitted).  However, the
covenant of good faith and fair dealing "does not impose any
obligation upon a party to the contract beyond what the explicit
terms of the contract provide." Silvester v. Time Warner, Inc.,
763 N.Y.S.2d 912, 918 (N.Y. Sup. 2003).

The New York Court of Appeals recently clarified the
covenant's scope as applied to discretionary clauses.  In Moran
v. Erk, 901 N.E.2d 187, 188 (N.Y. 2008), the plaintiffs entered
into a contract for the sale of a house with the defendants.
The contract contained an attorney approval contingency rider
that allowed either party's attorney to disapprove the contract
within a certain period after signing. Id. at 189.  After
signing the contract, the defendants had second thoughts and
instructed their attorney to disapprove the contract. Id.  The

plaintiffs eventually sold the house to a second buyer for a lower price and then sued the defendants for the difference. Id.

The Court of Appeals held that the implied covenant of good faith and fair dealing did not limit the attorney's ability to approve or disapprove the contract. Id. at 190, 192.  The Court noted that the approval clause specifically stated, without limitation, that the contract was contingent upon approval by the parties' attorneys.  While the implied covenant of good faith and fair dealing requires parties to refrain from "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," "the plain language of the contract in this case ma[de] clear that any 'fruits' of the contract were contingent on attorney approval, as any reasonable person in the [plaintiffs'] position should have understood." Id. at 190 (citations omitted).

While Moran's holding was confined to attorney approval clauses in real estate contracts, other courts have extended Moran's logic to other types of discretionary clauses. See Paxi, LLC v. Shiseido Americas Corp., 636 F. Supp. 2d 275, 286 (S.D.N.Y. 2009) ("Following [Moran's] logic, the obligation of good faith and fair dealing does not negate a[n] expressly bargained-for clause that allows a party to exercise its discretion, unless that clause imposes a limit on the discretion

to be exercised or explicitly states that the duty of good faith and fair dealing applies."); Stokes v. Lusker, No. 08 Civ. 3667 (CM), 2009 WL 612336, at *8 (S.D.N.Y. Mar. 4, 2009) (applying Moran's reasoning and declining to insert a good faith requirement to alter the plain meaning of a real estate contract).

As in Moran, the plain language of the May 12 fax makes clear that any fruits of the alleged contract in this case were contingent on Shinkong's approval of Perrier as a protected customer. (See Caruso Decl. Ex. 28.) A reasonable person in World Wide's position would have understood that Shinkong had not approved Perrier and that World Wide therefore did not have the right to enjoy the fruits of selling Shinpet to Perrier as a protected customer. Indeed, the record demonstrates that World Wide acknowledged these facts to Shinkong in July 1999 and May 2001. (Geremia Decl. Ex. I; Barrese Dep. Ex. 29.) World Wide made these acknowledgments despite asserting that it knew that Shinkong had misrepresented its existing relationship with Perrier. (Caruso Decl. ¶ 73.)

A plain reading of the May 12 fax therefore leads to the conclusion that Perrier was not a protected customer. Interpreting the contract according to its plain meaning promotes clarity and predictability, two concepts that are "particularly important in the interpretation of contracts."

Moran, 901 N.E.2d at 190.  Had World Wide wished for a more restrictive definition of customer approval, it could have bargained with Shinkong to include specific limitations on Shinkong's ability to reject potential customers.  World Wide instead forged ahead under the terms of the May 12 fax and acknowledged to Shinkong that Perrier was not a protected customer.

Therefore, because World Wide has failed to raise a genuine issue of material fact as to whether it suffered irreparable damages and whether Perrier was a protected customer, Shinkong is entitled to summary judgment as to World Wide's fifth cause of action for injunctive relief.

### C. Shinkong's Counterclaim

Shinkong counterclaims for $94,867.20 that it is allegedly owed by World Wide.  In a fax dated September 6, 2001, World Wide wrote, in regards to a shipment of 1440 metric tons of resin, that it "guarantee[d] to remit any and all duties to Shinkong Synthetic Fibers Corp. that [were] refunded by the U.S. Government immediately upon receipt." (Barrese Dep. Ex. 30.) World Wide admits that the United States Government refunded to World Wide $94,867.20 in connection with this shipment, and that World Wide has not remitted this money to Shinkong. (Answer and Counterclaim ¶¶ 77-78; Reply to Counterclaim ¶¶ 6-7; Barrese Dep. 197:7-200:6.)

World Wide nevertheless argues that it is not obligated to remit the money because Shinkong materially breached the parties' contract.  "When a party has breached a contract, that breach may excuse the nonbreaching party from further performance if the breach is 'material.'" New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 117 (2d Cir. 2006) (citing Callanan v. Powers, 199 N.Y. 268, 284 (N.Y. 1910)).  World Wide argues that the September 6, 2001 fax is "nothing more than a refinement of the parties' original [May 1999] agreement" and that Shinkong breached this agreement by selling to World Wide's protected customers. (Opposition 17 n.3.)  Shinkong argues that the September 6 fax is distinct from the May 1999 agreement and that, in any event, Shinkong did not breach the May 1999 agreement.

### 1. Mutually Dependent Contracts

"Whether the parties intended to treat [two] agreements as mutually dependent contracts, the breach of one undoing the obligations under the other, is a question of fact." Rudman v. Cowles Commc'ns, Inc., 280 N.E.2d 867, 873 (N.Y. 1972).  "In determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in the surrounding circumstances." Id.; see TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 89 (2d Cir. 2005).  While a party's intent is typically a question of fact for the jury, the

question is a matter of law for the court if the documents reflect no ambiguity as to whether they should be read as a single contract. TVT Records, 412 F.3d at 89.

Typically, instruments that are executed at substantially the same time and relate to the same subject matter are read together as one. See Nau v. Vulcan Rail & Constr. Co., 36 N.E.2d 106, 110 (N.Y. 1941); This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998) ("Under New York law, all writings forming part of a single transaction are to be read together."). Where contracts are not executed at the same time, they may still be construed as a single agreement if "the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise or set of promises had been stricken." Commander Oil Corp. v. Advance Food Service Equipment, 991 F.2d 49, 53 (2d Cir. 1993) (quoting 6 Williston, Contracts, § 863, at 275 (3rd ed. 1970) and citing Williams v. Mobil Oil Corp., 445 N.Y.S.2d 172, 175 (N.Y. App. Div. 1981)).

The May 12 and September 6 faxes both concerned the remittance of refunded duties. The May 12 fax set forth the general framework for the parties' commercial relationship, stating:

> SHINKONG AGREES TO REDUCE SALES PRICE TO COVER THE
> DUTY PORTION (USD16/MT + 7.8%) OF TRANSACTIONS UNTIL
> THAILAND GSP STATUS IS VOTED BACK IN, INSURING WWP CAN
> CONTINUOUSLY SUPPLY SHINPET PET TO ITS CURRENT
> CUSTOMERS.  ALSO, ONCE THE U.S. GOVERNMENT REFUNDS THE

> DUTIES PAID.  THEN THE TOTAL AMOUNT OF THE AFORESAID
> DUTIES SHALL BE REFUNDED TO ESCROW OR BANK ACCOUNTS
> DESIGNATED BY SHINKONG.  IN THE EVENT OF PRICE HIKE
> DURING THE PERIOD, BOTH TWO PARTIES AGREE SALES PRICE
> WILL BE PROPORTIONALLY ADJUSTED.

(Caruso Decl. Ex. 28.)  The September 6 fax, by contrast, concerned a single shipment of 1440 metric tons of resin. (Barrese Dep. Ex. 30.)  World Wide sent this second fax over two years after the May 12 fax. See Rudman, 280 N.E.2d at 873 ("Although form is not conclusive, that the parties entered into separate written agreements with 'separate assents' rather than a 'single assent' is influential.").

However, several material facts remain unclear.  The May 12 fax stated that the reduced sales price arrangement and remittance of duty payments would last until the reinstatement of Thailand's GSP status.[6]  The record does not indicate whether Thailand's GSP status had been reinstated as of September 6, 2001, and the parties do not discuss the issue in their briefs. Nor do the parties address the reference to "USD 65.88/Mt. (USD 790/Mt. FOB X 7.2% + 0.09/kg)" as the "Total Duty" in the September 6 fax and how (or if) this relates to the "duty portion" of "USD16/MT + 7.8%" mentioned in the May 12 fax. Genuine issues of material fact therefore remain as to whether

---

[6] With GSP status, Shinkong could ship resin from its plants in Thailand to the United States duty-free. (Deposition of Andrew Hsu ("Hsu Dep.") 61:12-13, Apr. 21, 2009.)

the shipment referenced in the September 6 fax was one of the transactions contemplated by the May 12 fax.

### 2. Customer Protection Status for Schmalbach and Ball

Assuming that the May 12 and September 6 faxes form a single agreement, genuine issues of fact also exist as to whether Shinkong breached that agreement.  As with Perrier, World Wide's breach of contract argument rests on the premise that Schmalbach and Ball were protected customers.[7]  Shinkong argues that the record clearly establishes that Shinkong denied protected status for Schmalbach and Ball in October 1999.  World Wide argues that the record presents a genuine issue as to whether Shinkong approved the two customers by remaining silent after World Wide's submission of the May 5 customer list.

### i. The September-October 1999 Exchange

On September 16, 1999, World Wide requested that Shinkong issue a "letter of protection" for a specific list of customers. (Barrese Dep. Ex. 10.)  The list was divided into World Wide's

---

[7] While the allegations in the Complaint are not limited to Perrier, Schmalbach, and Ball, the parties have limited their briefing to these three customers because they allegedly form the "crux of the claims in this action." (Letter from Richard A. De Palma, Sept. 17, 2009.) To the extent that World Wide could assert other breach of contract defenses against Shinkong's counterclaim based on other customers, the Court deems such defenses abandoned. See Taylor v. City of N.Y., 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

current customers, customers currently testing Shinpet, and
customers for whom Shinpet/Pepsi approval was pending. (Id.)
Schmalbach was listed as a customer currently testing Shinpet;
Ball was listed as a customer pending Shinpet/Pepsi approval.
(Id.)  After several attempts by World Wide to get a response,
Shinkong replied on October 1, 1999 that it would "[f]ully
protect all current customers" on the list if World Wide was
able to verify its transactions with the customers. (Id.
Ex. 15.)  Shinkong also agreed to protect customers currently
testing Shinpet until the end of 1999, but added that
"Schmalbach-Lubeca [was] excluded from this list." (Id.)
Finally, other customers were declared to be "open." (Id.)

      World Wide does not dispute that Shinkong purported to
reject Schmalbach as a protected customer in the October 1 fax.
(See Pl. 56.1 stmt. ¶ 26; Opposition 9; Caruso Dep. 158:13–19,
159:21–25.)  Indeed, in response to Shinkong's position in 1999
on customers currently testing Shinpet, World Wide stated that
it would "formally register [the] new potential customers once
they purchased Shinpet." (Barrese Dep. Ex. 16.)  World Wide
specifically affirmed Shinkong's position regarding Schmalbach
over a year later, writing that it would "honor the direct
marketing channel [Shinkong had] already established on [its]
own such as SL Plastics, CGR and Perrier." (Id. Ex. 29.)

Similarly, World Wide does not dispute Shinkong's position that the October 1 fax purported to reject Ball. (Pl. 56.1 stmt. ¶¶ 27-28; Barrese Dep. Ex. 15.)  While Caruso testified that he did not understand what Shinkong meant by "other customers" and "open," (Caruso Dep. 163:9-164:11, 165:7-9),  Barrese testified that he understood the October 1 fax to represent Shinkong's view that Ball was not a protected customer, (Barrese Dep. 166:16-21).  Barrese's account is consistent with the memo that World Wide sent to Shinkong later that same day.  The memo did not ask Shinkong what "other customers" or "open" meant, but rather "noted" Shinkong's position that these other customers were open. (Id. Ex. 16.)  Barrese testified that while World Wide did not agree with Shinkong's position that Ball was not protected, whether Ball was protected at that time was "an irrelevant issue because [it] had no Pepsi approval and you couldn't sell to [it]." (Id. 149:17-20.)

### ii. The May 1999 List

Instead of disputing Shinkong's October 1 rejection of Schmalbach and Ball as protected customers, World Wide argues that the two end-users were already protected by the time Shinkong attempted to reject them.  Specifically, World Wide argues that Shinkong's silence following World Wide's May 5, 1999 fax, which listed Schmalbach and Ball as customers "it was registering with Shinkong for protection in the North American

39

Market," satisfied the parties' agreed-upon process for conferring protected status to customers. (Caruso Decl. Ex. 23; Opposition 9.)

Ball was also included in a fax sent from World Wide to Shinkong on May 4, the day before Caruso's meeting with Chairman Wu, in which World Wide listed the amount of PET that it had supplied to various end-users in 1998. (Caruso Decl. Ex. 24.) Finally, Ball was included in a second memo sent to Shinkong on May 5 that listed North American Pepsi Converters. (Id. Ex. 24.) In this fax, World Wide noted that it was currently speaking with the Pepsi converters and that the converters required all resin used in their plants to be "Pepsi Approved." (Id.)

The May 12 fax does not define the standard by which Shinkong would approve customers or the method by which it would notify World Wide of a customer's status. (See Caruso Decl. Ex. 28.)  The word "approve" often conveys an expressive element.  Black's Law Dictionary, for example, defines approve as "[t]o give formal sanction to; to confirm authoritatively." Black's Law Dictionary 118 (9th ed. 2004).  Similarly, Webster's Third New International Dictionary defines approve as "to express often formally agreement with and support of or commendation of as meeting a standard." Webster's Third New International Dictionary 106 (1986).  The word does not necessarily imply overt communication, however.  Webster's, for

40

example, also defines approve as to "have or express a favorable opinion or judgment of." Id. (emphasis added).

"[A]mbiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 178 (2d Cir. 2004) (quoting World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d Cir. 2003), overruled on other grounds by Wachovia Bank, N.A., v. Schmidt, 546 U.S. 303, 309-10 (2006)).

Unfortunately, the information in the record concerning the customs, practices, usages and terminology of the resin distribution industry does not entirely clarify the meaning of the parties' agreement.  Caruso testified that customer protection agreements may or may not be memorialized in writing; even where memorialized, the agreements typically do not contain a written framework for approving protected customers. (Caruso Dep. 12:13-18, 17:24-18:8.)  Rather, a supplier may approve a customer verbally, by email, or by written correspondence, (Id. 15:13-15); alternatively, a supplier might approve a customer by not responding at all after a distributor submits a list with

41

the customer's name, (Id. 19:24–20:8).  The customs and
practices of the PET industry regarding customer approval are
even less clear given the fact that World Wide does not have any
other written agreements with suppliers that require approval by
the supplier for customers to be protected. (Pl. 56.1 stmt.
¶ 10.)  In sum, the customs and practices of the PET industry as
described in the record do not shed a light on the specific
meaning of customer approval in the instant agreement.

   Because the May 12 fax is facially ambiguous as to the
parties' intentions regarding customer approval, the Court may
consider extrinsic evidence to ascertain the correct and
intended meaning of the agreement. See Eternity Global Master
Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177-
78 (2d Cir. 2004).  Under New York law, the "the aim is a
practical interpretation of the expressions of the parties to
the end that there be a 'realization of (their) reasonable
expectations.'" Brown Bros. Elec. Contractors, Inc. v. Beam
Const. Corp., 361 N.E.2d 999, 1001 (N.Y. 1977) (quoting
1 Corbin, Contracts, § 1).  The parties' reasonable expectations
as to the meaning and intent of their language should be
gathered from "the situation of the parties, their surroundings
and circumstances, [and] the occasion and apparent object of
their stipulations." Kitching v. Brown, 73 N.E. 241, 242 (N.Y.
1905); see also Brown Bros., 361 N.E.2d at 1001

("[D]isproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain."); SR Int'l Bus. Ins. Co., Ltd. v. World Trade Center Props., LLC, 467 F.3d 107, 126 (2d Cir. 2006) ("[W]hen a contract is ambiguous, the court may and should look to the prior negotiations [of the parties] to determine what was intended.") (quoting Rudman, 280 N.E.2d at 872) (quotation marks omitted).

The parties' interactions and communications prior to, during, and after the May 5 meeting cast doubt on World Wide's assertion that the submission of a customer list and Shinkong's silence were all that were required for customers to obtain protected status. (Pl. 56.1 stmt. ¶ 108.) During a 1998 meeting between Caruso, Barrese, and Paul Chu, the parties discussed and agreed "that customer protection would be provided to all customer accounts resulting from WWP's efforts once the customer in question approved SHINPET for use in their processes"; after the customer approved Shinpet, World Wide would register the customer in writing. (Id. ¶ 82 (emphasis added).) Similarly, in response to several faxes from Shinkong in November 1998 requesting end user information, World Wide informed Shinkong that it would register each customer "upon their approval of

43

Shinpet." (Caruso Decl. Exs. 2, 4, 6.)  This correspondence
suggests that the parties' understanding leading up to the May
1999 agreement was that a customer's approval of Shinkong's
material would precede World Wide's registering the customer and
Shinkong's approving the customer.

Correspondence sent the same day as the May 5 meeting
between Chairman Wu and Caruso similarly suggests that the
parties may not have understood that a customer would be
approved simply because World Wide submitted its name to
Shinkong.  In the same May 5 memo that contained World Wide's
list of customers for registration, Caruso stated that the list
represented "a large gathering of customers, where [World Wide]
anticipate[d] introduction and qualification of Shinkong,
Shinpet material." (Id. Ex. 23.)  This process, he noted, could
"take longer than the allotted time that Shinkong ha[d]
specified for complete customer protection and [World Wide]
kindly request[ed] that [Shinkong] allow [it] a reasonable
amount of time to obtain the individual approvals that [were]
necessary in order to penetrate these various specialty
markets." (Id.)  These specialty markets were "Dairy, Alcohol,
Pepsi-Cola NA and Pharmaceutical [DMF]." (Id.)

Caruso testified that time was given for customers to
approve Shinpet because Shinkong had told World Wide that it
would not provide protection for a customer until the customer

44

approved the material and World Wide made a sale to the customer. (Caruso Dep. 125:22-126:3.)  Customer approval and a sale to the customer were necessary to "complete[] the commercial cycle of deeming [the customer] a Shinpet customer exclusively for World Wide." (Id. 147:3-6, 150:16-21.)

Caruso did not discuss silence as acceptance at the May 5 meeting with Chairman Wu. (Caruso Dep. 79:18-23.)  In fact, World Wide never communicated to Shinkong its understanding that silence would equal acceptance. (Id. 79:12-80:3, 87:5-19.)  Similarly, Shinkong never communicated to World Wide an understanding that silence would equal acceptance. (Id. 88:4-9.)

These circumstances suggest that the parties would not reasonably have understood that Schmalbach and Ball were protected customers simply because World Wide had submitted the May 5 list to Shinkong.  As indicated in World Wide's September 16 fax, neither Schmalbach nor Ball had approved Shinpet at the time World Wide sought written confirmation that Shinkong would protect them. (Caruso Decl. Ex. 41.)  Schmalbach was listed as still testing the material. (Id.)  Similarly, World Wide had not yet approached Ball about purchasing Shinpet; indeed, Barrese testified that whether Ball was a protected customer "wasn't an issue" that World Wide was interested in pushing until Shinpet received Pepsi approval. (Barrese Dep. 166:13-15.)  At the time that Shinkong rejected Schmalbach and Ball, World Wide did not

45

attempt to argue that the two were already protected customers.
World Wide did not remind Shinkong of the May 5 list or the May
12 fax; rather, it sought repeatedly over the next year and a
half to get Shinkong to issue written customer protection
letters and to sign new proposed customer protection agreements.
(Barrese Dep. Exs. 17, 24; Caruso Dep. Exs. 36, 43.)

Despite all of this, several facts remain that, when viewed
in a light most favorable to World Wide, render the parties'
understanding of customer approval unclear and summary judgment
inappropriate.  First, although the May 5 fax suggests that
complete customer protection would not be afforded to customers
until they approved Shinpet, the fact remains that World Wide
submitted the list—at Shinkong's request—before any customer
had approved the material.  World Wide asserts that in several
conversations in late 1998, Paul Chu repeatedly assured World
Wide that Shinkong would grant customer protection for all
customers derived from World Wide's efforts. (Caruso Decl.
¶ 59.)  Similarly, Caruso testified that during the May 5
meeting, he told Chairman Wu that World Wide would only promote
Shinpet to its current customers, who were then using resin from
other suppliers, if Shinkong gave World Wide the "approval to go
ahead under the conditions that [Shinkong] would not contact
[World Wide's] customers or any of [Shinkong's] other people or
agents in the United States." (Caruso Dep. 77:2-5.)  Chairman Wu

46

then shook his hand and agreed. (Id. 77:5.) That same day,
Shinkong requested that World Wide fax over its customer list.
(Id. 78:5-8.) A reasonable person could infer from these events
that the parties reasonably expected that World Wide's current
customers, which included Schmalbach and Ball, (Caruso Decl.
¶¶ 22, 176), would be protected during the time that it took
World Wide to get them to switch from other resin to Shinpet.

Several other facts from the record could support this
conclusion. In Shinkong's October 1 fax, for example, it agreed
that customers who were currently testing Shinpet (with the
exception of Schmalbach) were fully protected until the end of
1999, contradicting its argument that customers were only
protected after they approved Shinpet. (Caruso Decl. Ex. 42.)
This contradiction exemplifies a general pattern of confusing
correspondence sent from Shinkong throughout the parties'
relationship, seemingly due in part to the fact that Shinkong
kept appointing different individuals to handle communication
with World Wide. (Id. ¶¶ 116, 123, 126.) As of October 2000,
for example, Shinkong claimed that it was "prohibited to give
the so-called 'CUSTOMER PROTECTION' to any of [its] agents."
(Caruso Dep. Ex. 39.) Such confusing and contradictory
correspondence makes it difficult to discern Shinkong's intent.

The parties' understanding is further clouded by the fact
that Shinkong had seemingly approved customers in the past by

simply accepting a customer list.  On January 22, 1999, for
example, Shinkong asked World Wide to send information on the
end-users for a certain shipment of resin "IN ORDER FOR
[SHINKONG] TO PROTECT [WORLD WIDE'S] EXCLUSIVE SALES RIGHT."
(Caruso Decl. ¶ 13.)  World Wide submitted the requested list.
(Id. ¶ 15.)  Shinkong thanked World Wide for the list and asked
for clarification as to the spelling of one customer's name;
World Wide provided the clarification. (Id. ¶¶ 16, 17.)  The
record does not contain any follow-up requests from Shinkong or
any discussions of whether the submitted customers approved the
product.

     The parties' reasonable understanding of the May 1999
agreement is also cast into doubt by their July 1999 exchange
regarding World Wide's complaint that another distributor had
approached Schmalbach to offer it Shinpet. (Caruso Decl.
Exs. 36-37, 39.)  World Wide complained that Shinkong was unable
"to protect [World Wide's] registered customers" with its
current organizational structure. (Id. Ex. 36).  Paul Chu
assured World Wide that Chairman Wu had instructed the sales
department to "correct" the problem and that Shinkong had
decided to reorganize its marketing and sales departments in
response to the incident. (Id. Exs. 37, 39).  A similar
interaction occurred in November and December 1999.  After World
Wide complained again about another distributor contacting its

48

customers, Shinkong wrote that World Wide should "please trust Shinkong's assurance to protect [its] registered customers." (Id. Ex. 46.)  A reasonable juror could infer from these exchanges that the parties' understood that Schmalbach was protected in July 1999 and that other customers were protected in December 1999.  Viewed in a light most favorable to World Wide, Shinkong's various assertions to the contrary could be seen as the product of constantly shifting personnel who were unaware of the parties' original intentions as to the May 1999 agreement.

### 3. World Wide's Minimum Monthly Purchase Requirements

Shinkong alternatively argues that World Wide cannot use Shinkong's alleged breach for its benefit because World Wide itself breached the agreement by failing to "REGULARLY BUY ABOUT 460MT SHINPET 5015W ON A MONTHLY BASIS WITHOUT PEPSI COLA APPROVAL." (Caruso Decl. Ex. 28.)  Shinkong argues that World Wide's records show that it purchased, on average, only 192 metric tons of resin per month through year-end 1999.  World Wide does not appear to dispute this average amount.[8]  Instead, it argues that Shinkong's own actions prevented certain sales of

---

[8] World Wide writes in its Opposition that "[o]n a cumulative basis, without Pepsi North American approval, WWP an average [sic] of over 500MT per month of SHINPET." (Opposition 12.)  It is unclear what World Wide is referring to here.  The single sentence stands alone and is not accompanied by any citation to the record.

Shinpet and that, in any event, Shinkong waived any alleged
breach by continuing to perform under the contract for another
two years.

The single case that Shinkong cites in support of its
argument, ALJ Capital I, L.P. v. David J. Joseph Co., No.
601591/06, 2007 WL 1218355, at *5 (N.Y. Sup. Mar. 13, 2007),
involved the plaintiffs' failure to fulfill a condition
precedent to the defendant's obligation to perform under a
claims assignment agreement.  Neither party in the instant case
makes any argument as to whether the minimum monthly purchase
requirement constituted a condition precedent to Shinkong's
obligation to pay.  Nor does either party discuss whether the
alleged failure to comply with the purchase requirement
constituted a material breach of the contract. See In re
Lavigne, 114 F.3d 379, 387 (2d Cir. 1997) ("[U]nder New York
law, only a breach in a contract which substantially defeats the
purpose of that contract can be grounds for rescission.  The
non-breaching party will be discharged from the further
performance of its obligations under the contract when the
breach goes to the root of the contract.") (quotation marks
omitted); Restatement (Second) of Contracts § 237 comment b
(1981).

The parties' failure to discuss these issues is compounded
by their failure to discuss what the parties intended by

agreeing that World Wide would purchase "about 460MT" per month.
(Caruso Decl. Ex. 28.)  A plain reading of the May 12 fax
suggests that the parties contemplated some level of flexibility
in the amount of Shinpet World Wide would purchase, presumably
based on its customers' needs.  Neither party points to any
evidence in the record to explain this choice of language,
however.

Even assuming that World Wide failed to fulfill a condition
precedent or materially breached the agreement, a genuine issue
of fact exists as to whether Shinkong waived any such breach.
"A waiver is the voluntary abandonment or relinquishment of a
known right." Jefpaul Garage Corp. v. Presbyterian Hosp., 462
N.E.2d 1176, 1177 (N.Y. 1984).

> Because waiver of a contract right must be proved to
> be intentional, the defense of waiver requires a
> 'clear manifestation of an intent by plaintiff to
> relinquish her known right' and 'mere silence,
> oversight or thoughtlessness in failing to object' to
> a breach of the contract will not support a finding of
> waiver.

Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of
New Jersey, Inc., 448 F.3d 573, 585 (2d Cir. 2006) (quoting
Courtney-Clarke v. Rizzoli Intern. Publ'ns, Inc., 676 N.Y.S.2d
529, 529 (N.Y. App. Div. 1998)).  "[T]he intent to waive is
usually a question of fact." Jefpaul Garage Corp., 462 N.E.2d at
1178-79; see Beth Israel Med. Ctr., 48 F.3d at 585 ("So much
depends upon the intention of the parties that, where such

intent is disputed, it necessarily becomes a question for the determination of a jury.") (quoting Champion Spark Plug Co. v. Autom. Sundries Co., 273 F. 74, 80 (2d Cir. 1921)).

The record here demonstrates that the parties continued operating under the same general business framework in 2000 and 2001, with World Wide purchasing various quantities of Shinpet to sell to end users. Shinkong would have been aware of World Wide's failure to satisfy the minimum monthly purchase requirement in 1999. Yet the parties do not point to any communications or testimony in the record, aside from the May 12 fax, discussing the monthly purchase requirement. Given this lack of information, Shinkong's intent to waive its rights under the parties' agreement remains an issue of fact to be determined at trial.

In sum, the record before the Court reveals a confusing series of interactions between the parties. Given the testimony and documents set forth above, genuine issues remain as to whether the May 12 and September 6 faxes constituted a single agreement; what the parties reasonably understood customer approval to mean; whether Schmalbach and Ball were protected customers following the submission of the May 5 customer list; and whether Shinkong materially breached the parties' agreement by selling Shinpet to Schmalbach and Ball.

## III. Conclusion

For the reasons stated above, Shinkong's motion for summary judgment is GRANTED as to World Wide's claim for injunctive relief and DENIED as to Shinkong's counterclaim for breach of contract.  Counsel shall confer and inform the Court no later than August 13 how they propose to proceed.


SO ORDERED:

DATED:     New York, New York
           July 30, 2010

                              _____
                              LORETTA A. PRESKA, Chief U.S.D.J.